FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

2011 JAN 19  A 11: 55

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

JOHN M. WYATT, III,
16605 Chalice Court
Dumfries, Virginia   22025,

BABY EMMA,
c/o John M. Wyatt, III
16605 Chalice Court
Dumfries, Virginia   22025,

-and-

JERI M. WYATT,
16605 Chalice Court
Dumfries, Virginia   22025,

      Plaintiffs

v.

Civil Action No. 1:11cv58  GBL/IDD

MARK T. McDERMOTT, ESQUIRE,
3715 Calvend Lane
Kensington, Maryland   20895,

**JURY TRIAL DEMANDED**

ACT OF LOVE ADOPTION SERVICES, INC.,
(DBA:  A ACT OF LOVE, ALTERNATIVE
OPTIONS AND SERVICES FOR CHILDREN)
9561 South 700 East, Suite 101
Sandy, UT   84070
   SERVE:  Kathleen Kunkel, Registered Agent
         9561 South 700 East, Suite 101
         Sandy, UT   84070,

LARAINE MOON,
3438 S 475 W 475
Bountiful, UT   84010,

LARRY S. JENKINS, ESQUIRE,
932 Northridge Drive
Bountiful, UT   84010,

**WOOD JENKINS LLC,**                              :
60 East South Temple, Suite 500                   :
Salt Lake City, UT  84111                         :
                                                  :
**THOMAS I. ZAREMBINSKI,**                        :
2572 East 3210 South                              :
Salt Lake City, UT 84109,                         :
                                                  :
and                                               :
                                                  :
**CHANDRA JONES ZAREMBINSKI,**                    :
2572 East 3210 South                              :
Salt Lake City, UT  84109,                        :
                                                  :
      Defendants    :

## COMPLAINT

### I. PARTIES

1. John M. Wyatt, III is a resident of the Commonwealth of Virginia and the next friend and biological father of the minor child "Baby Emma." He is the custodial parent of the child Baby Emma in accordance with an Order of the Juvenile & Domestic Relations Court of Stafford County, Virginia, entered on December 11, 2009.

2. "Baby Emma" is the biological child of plaintiff John M. Wyatt, III and Emily Colleen Fahland [hereinafter "Colleen Fahland"]. Baby Emma was born February 10, 2009 in Prince William County, Virginia and is currently being unlawfully detained in the state of Utah by various of the defendants. She was named Edrienne Emma Fahland on her Virginia birth certificate, but it is not clear what name is being used now in Utah. Her legal residence is with her father, her custodial parent, in Virginia.

3. Jeri M. Wyatt is the paternal grandmother of Baby Emma and is a resident of the Commonwealth of Virginia.

2

4. Mark T. McDermott is a resident of the State of Maryland and a lawyer licensed to practice in Maryland, the District of Columbia, and Virginia. McDermott is employed at Law Offices of Mark T. McDermott with an office at 910 Seventeenth Street, N.W., Suite 800, Washington, D.C. He specializes in adoption law matters and previously represented Colleen Fahland in the matter that caused Baby Emma to be wrongfully removed to the state of Utah. As an attorney licensed in the Commonwealth of Virginia, McDermott transacts business and has contracted to supply services within the Commonwealth. He also caused tortious injury by virtue of his acts or omissions within Virginia, as described herein.

5. A Act of Love Adoption Services, Inc., dba A Act of Love, Alternative Options and Services for Children [hereinafter "Act of Love"], is located in the state of Utah and incorporated in the state of Utah. It is owned and operated by Kathleen Kunkel (among other businesses owned and operated by her). As set forth herein, Act of Love caused the Plaintiffs tortious injury by virtue of its acts or omissions within Virginia and elsewhere.

6. Laraine Moon is an employee of Act of Love and a resident of the state of Utah. All her actions herein were taken in her capacity as an Act of Love employee and she caused the plaintiffs tortious injury by virtue of her acts or omissions in Virginia, as described herein.

7. Larry S. Jenkins, Esquire is a resident of the state of Utah and an attorney licensed to practice law in the state of Utah. Jenkins specializes in representing both adoption agencies and biological mothers in adoptions. As set forth herein, Jenkins transacted business and conspired with the other defendants in Virginia in that he engaged in purposeful activity in Virginia, and he caused the plaintiffs tortious injury by virtue of his acts or omissions within Virginia and elsewhere.

3

8. Wood Jenkins LLC is a law firm located in the state of Utah.  Larry Jenkins is a member of the law firm and his actions were taken as a member and employee of, and within the scope of, his employment with Wood Jenkins LLC.  As set forth herein, Wood Jenkins LLC transacted business in Virginia in that it engaged in purposeful activity in Virginia and conspired with others in Virginia and elsewhere.  It caused the plaintiffs tortious injury by virtue of its acts or omissions within Virginia as well as elsewhere.

9. Thomas Zarembinski and Chandra Zarembinski are residents of the State of Utah.  In or about June, 2008 they retained Act of Love to purchase a baby.  Thomas and Chandra Zarembinski [hereinafter "the Zarembinskis"] have principally funded the conspiracy complained of herein and currently wrongfully possess Baby Emma.  As set forth herein, the Zarembinskis caused the plaintiffs tortious injury by virtue of their acts or omissions both within Virginia and elsewhere, as described herein.

## II.    JURISDICTION

10. This Court has jurisdiction in this matter under 28 U.S.C. § 1332 based on diversity of citizenship and amount.  The Court also has federal question jurisdiction under 28 U.S.C. § 1331 due to the violations of the civil rights of all plaintiffs based on 42 U.S.C. § 1983 and supplemental jurisdiction over Virginia state claims pursuant to 28 U.S.C. § 1367.

11. Personal jurisdiction over the defendants arises under Va. Code Ann. § 8.01-328.1 in that the defendants transacted business in Virginia, contracted to supply services in Virginia, or caused tortious injury by an act or omission in Virginia.

## III.   VENUE

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that a substantial part

of the events giving rise to the claims in this case occurred in this district in Prince William County, Virginia.

## IV.   NATURE OF THE ACTION

13. This is an action against the defendants principally for conspiracy to kidnap plaintiff Baby Emma from her parental home with her father; to deny plaintiff John M. Wyatt, III (hereinafter "John Wyatt") his parental rights; to wrongfully conspire to deny plaintiff Jeri M. Wyatt (hereinafter "Jeri Wyatt") her normal familial relationship with her granddaughter Baby Emma; to kidnap Baby Emma and deny her the right to be with one or both of her biological parents; and to deny the plaintiffs their civil rights. Plaintiffs also seek a declaratory judgment that the Parental Kidnapping Protection Act (hereinafter "PKPA") provides jurisdiction over custody of Baby Emma in the courts of the Commonwealth of Virginia.

## V.   STATEMENT OF FACTS

### Relationship Between John Wyatt and Colleen Fahland

14. Plaintiff John Wyatt and Colleen Fahland have known each other since the second grade. Colleen Fahland and her mother and father have lived in Stafford County, Virginia continually since John Wyatt met Colleen Fahland until the present. The Wyatt family has lived in Prince William County, Virginia for more than thirteen (13) years.

15. John Wyatt and Colleen Fahland went to school together at St. William of York Catholic School in Stafford County, Virginia from grades 2 through 8. Thereafter, Colleen Fahland went to high school in Stafford County, Virginia and John Wyatt went to Forrest Park High School in Prince William County, Virginia. They dated for a considerable period of the time they were in high school and were close personal friends.

5

16. After graduating from high school in 2007, John Wyatt and Colleen Fahland started dating again.

17. In or about June 2008, Colleen Fahland learned that she was pregnant with John Wyatt's child. Thereafter, for the next several months, Colleen Fahland, who was a student at George Mason University, spent many weekends at the Wyatt home in Prince William County, Virginia. She would drive there herself many weekends and was completely familiar with the location and the address of that home.

### John Wyatt's Efforts Prior to Birth and Removal of Baby Emma to Develop Parental Relationship

18. After John Wyatt learned that Colleen Fahland was expecting his child, John Wyatt demonstrated his intention, interest, willingness and commitment to accept the full responsibilities of fatherhood and to establish and maintain a parent child relationship after the baby was born. John Wyatt and Colleen Fahland frequently discussed the baby and that he would participate fully in the birth and rearing of his child.

19. John Wyatt went to medical appointments with Colleen Fahland, offered to marry Colleen Fahland and offered to pay for medical treatment (which Colleen Fahland refused as she had insurance). They picked out baby names together and discussed plans of how they could support and raise the baby together. They talked almost daily over several months, either on the telephone or in person, and often about raising their baby together.

### The Wyatts Prevent an Abortion of Baby Emma

20. Soon after Colleen Fahland learned that she was pregnant, her parents, Karen and Brad Fahland, who did not want Colleen to have their grandchild, insisted that she have an abortion. They threatened Colleen with expulsion from her home, loss of monies for college,

6

loss of financial support, etc.

21. Colleen Fahland told John Wyatt that her parents wanted her to go to the District of Columbia to have an abortion.

22. When plaintiff Jeri Wyatt, the paternal grandmother of Baby Emma, was informed of the plans for an abortion, she sought out Sr. Lisa Lorenz, a Catholic nun who is currently the principal of St. William of York Catholic School. Karen Fahland, Colleen's mother, on information and belief, works with Sr. Lorenz at the school.

23. In the Summer of 2009 when Sr. Lorenz was told by Jeri Wyatt about the planned abortion, she was successful in convincing the Fahlands, who are Catholic, to stop the abortion plans. Thereafter, Sr. Lorenz joined in efforts with the Fahland parents to deny John Wyatt and Jeri Wyatt their ultimate familial rights with Baby Emma, culminating in the kidnapping of Baby Emma.

### Colleen's Parents Secretly Arrange for Adoption of Baby Emma

24. Unbeknownst to John and Jeri Wyatt, on or before January 30, 2009, Mr. and/or Mrs. Fahland retained defendant Mark T. McDermott, Esquire (hereinafter "McDermott") to arrange for the adoption of Baby Emma. McDermott has websites regarding adoption procedures, and he is a founder and presently a board member of the American Academy of Adoption Attorneys. McDermott has a history of misconduct in adoption matters. Defendant Larry S. Jenkins (hereinafter "Jenkins") has also been a board member of the American Academy of Adoption Attorneys, and upon information and belief, has close business ties and relationships with defendant McDermott. Defendant Jenkins also has a history of misusing laws to deny biological fathers their parental rights.

7

25. On January 30, 2009, Colleen Fahland, who was over eight months pregnant, told John Wyatt that her mother wanted her to talk to an adoption attorney. She continued, however, to assure John Wyatt that they would raise the baby together.

26. On that same day, Colleen Fahland and, upon information and belief, her father met with McDermott. During this initial meeting, McDermott had Colleen Fahland sign a "Birth Mother's Marital History and Father Identification," a form from the American Academy of Adoption Attorneys. On that form, Colleen Fahland identified John Wyatt as the father of Baby Emma and provided his telephone number. She also wrote "he [John Wyatt] wants to keep the baby." Colleen Fahland offered to provide John Wyatt's address, which was known to her, but McDermott told her that he did not want the address and to falsely fill in the form under the father's address with "don't know address." Upon McDermott's direction, Colleen Fahland also provided other false information on the form.

27. In the meeting with McDermott and her father on January 30, 2009, Colleen Fahland signed a Birth Mother's Adoption Plan in which she indicated she would like any adoptive parents to meet with the birth father to discuss adoption. That was never done.

28. John Wyatt was purposely kept in the dark and deceived about the meeting with McDermott of January 30, 2009. He and Colleen Fahland continued to speak and in those conversations she told him that she intended that they would raise their baby together. These statements were false and known to be false by Colleen Fahland. Indeed, at the time the statements were made, Colleen Fahland, at the urging and insistence of her parents, had begun the process of having the baby adopted. Colleen Fahland made the false statements at the urging and insistence of her parents and McDermott and, through McDermott, defendants Jenkins and

8

Act of Love, with the intent of misleading John Wyatt so that he would not undertake the necessary steps to secure his legal rights as the biological father or to seek to prevent the adoption of his baby. John Wyatt did so rely upon the statements to his detriment and injury. Upon information and belief, Colleen Fahland made these false statements acting under the instruction of McDermott, backed up by the threats from her parents, to mislead John Wyatt.

### Involvement of Defendants Jenkins and Act of Love in Wrongful Acts

29. During the same period, McDermott involved defendants Jenkins and Act of Love in the conspiracy to take concerted actions following the birth of Baby Emma to wrongfully remove her from her biological father, paternal grandmother, her natural family, and her rightful home in the Commonwealth of Virginia.

30. Act of Love is an adoption agency in Utah. It is owned by Kathleen Kunkel, whose husband Dieter Kunkel is a Trustee and who also has a business relationship with the agency. Upon information and belief, Kathleen owns at least one other adoption agency and related entities which have a gross income of over $10 million over the last several years.

31. Defendant Jenkins and his law firm, defendant Wood Jenkins LLC, have for many years represented Act of Love and various other adoption agencies in the State of Utah. He refuses to represent putative fathers and has a long history of using and misusing the laws to wrongfully deprive biological and legitimate fathers of their children from many states of the union. He has earned substantial sums of money in these endeavors.

### Actions of Defendant Jenkins and State of Utah to Deprive Unmarried Biological Fathers of Their Rights

32. Jenkins is a registered lobbyist for at least two adoption agencies and is the legislative liaison for the Utah Adoption Council, of which he is a member. He also acts as a *de*

9

*facto* agent of and consultant to the Utah legislature on adoption matters.

33. Utah is dominated by the Church of Latter Day Saints (the Mormon Church). A legislator or public official who acted in derogation of basic tenets of the Mormon Church could not be normally elected to office. Also, court officials could not normally be appointed if they acted in derogation of the basic tenets of the Mormon Church. The state courts in Utah routinely very narrowly interpret oppressive legislation of the Utah legislature to facilitate deprivation of parental rights to putative fathers. In essence, the state of Utah does not have a realistic separation of church and state. This is contrary to the fundamental principles of the United States. This country was, in great part, founded by the Pilgrims and others escaping religious oppression. To have a system of laws based upon the religious beliefs of the Mormon Church is in derogation of the basic founding tenets of this country and contrary to the First Amendment to the United States Constitution.

34. A basic tenet of the Mormon Church is to encourage large families with many children. A further tenet of the Mormon Church is for families to have two married parents. Thus, the Utah legislature, in response to the Mormon Church and individual efforts of Jenkins and others profiting from the sale of children, has enacted laws and procedures to facilitate the taking of children of unmarried biological parents and having them adopted by two married parents residing in Utah. This wrongful taking of babies, tantamount to kidnapping, occurs regardless of court orders to the contrary from other states. Utah's laws also encourage the retention and harboring of children wrongfully taken from their lawful and biological fathers in other states.

35. Under Utah law, an unmarried biological father, even if from any other location and

10

even if he has no idea or inclination that his child will be in, or may be born in or taken to, Utah, must establish his parental rights by strictly complying with onerous statutory requirements. See Utah Code Ann. § 78 B 6-129, *et seq.* If the unmarried biological father fails to fully and strictly comply with these requirements, he is deemed to have waived and surrendered his rights in relation to his child, including the right to consent to or refuse to consent to the adoption of the child. The effect of the strict application of the Utah statutory procedures is to allow the termination of an unmarried biological father's parental rights without notice and without hearing and due process of law in violation of the father's constitutional rights.

36. Utah's statutory procedures, which allow for the severing of an unmarried biological father's parental rights without due process of law (even fathers from anywhere outside Utah), evidence the state's animus against unmarried biological fathers and an unconditional respect for a mother's exclusive decision making powers as to the custody and care of newborns, regardless of the children's best interests. Such a statutory scheme designed to facilitate the severing of an unmarried biological father's parental rights without due process of law serves to reinforce traditional stereotypical views about gender and childrearing in that women are biologically better suited to making decisions about newborn children and that a child is best reared in a household of two married adoptive parents.

37. The presiding judge of the Utah Court of Appeals recently recognized that Utah adoption laws put unmarried fathers in an "impossible bind," and the Chief Justice of the Utah Supreme Court also recently noted that Utah could become a national "magnet for those seeking to unfairly cut off opportunities" for qualified fathers.

38. It is in this setting that Jenkins and others similarly situated have acted in joint

11

participation and interaction with officials in the Utah legislature to enact laws that are draconian in nature and inimical to the rights of biological fathers whose babies are often fraudulently taken from them and removed to Utah, as occurred herein. The Utah legislature has deferred to and relied upon Jenkins in adopting his proposals to amend Utah's laws to further the practice of fraudulently purloining babies from their lawful biological fathers. Jenkins has apparently routinely conspired and acted in concert with at least one legislator to enact such laws. Jenkins then takes actions for considerable profits, as he did in Baby Emma's case, to use the Utah laws, first, to deprive biological fathers of their fundamental rights to develop a relationship with their sons or daughters and, then, to place the children in two parent adoptive families in Utah. Moreover, Utah courts strictly and narrowly construe these draconian statutes against biological fathers, apparently without due consideration of their Constitutional invalidity.

39. Recently, in early 2010, defendant Jenkins acted together with the Utah legislature to amend Utah's adoption and child custody code provisions to, *inter alia*, add provisions (1) that an out-of-state order adjudicating paternity does not entitle that person to notice, right to consent, or right to custody unless that person has strictly complied with Utah's requirements, and (2) that Utah courts shall dismiss a petition filed by an unmarried biological father if he is not entitled to consent under Utah's laws of strict compliance. Those amendments directly addressed John Wyatt's situation and the Virginia orders in 2009 granting him custody of his daughter, Baby Emma (*see supra*).

### Zarembinskis Pay Act of Love to Procure a Baby

40. In or about June, 2008, defendants Thomas and Chandra Zarembinski retained Act of Love to purchase a baby that they could adopt under the laws of the state of Utah. Upon

information and belief, these financial transactions reportedly cost $35,000 to $50,000.

41. Shortly before or after Colleen Fahland met with McDermott on January 30, 2009, defendants Jenkins, Act of Love, and the Zarembinskis all had been informed of the possible availability of Baby Emma for adoption. During this time, defendant Laraine Moon (hereinafter "Moon") was an employee of Act of Love.

42. At that point in time, it was made known to all of the defendants that John Wyatt would not agree to any adoption. To prevent John Wyatt from registering on the State of Utah putative father registry and from seeking other legal protections, the defendants agreed that John Wyatt would be kept in the dark about the planned adoption in Utah and would be falsely and fraudulently led to believe that he would participate in the birth and rearing of his child.

### Baby Emma Is Born Unbeknownst to John Wyatt

43. In the very beginning of February 2009, Colleen Fahland, at a regular obstetrician appointment, learned that she was dilated 2 cm and was told that the baby, which was due on February 21, 2009, could be born anytime within the following two weeks.

44. At that time, Colleen Fahland continued to make statements to John Wyatt that she intended that he would be present during the birth of the baby and that he would participate in decisions on the rearing of the baby. The statements that were made were false in that Colleen Fahland at the time did not intend for John Wyatt to be present during the birth of the baby nor for him to participate in the rearing of the child. They were made with the intent that John Wyatt would rely upon them to his detriment so that he would not take the necessary steps to secure his legal rights as the biological father or to prevent the adoption of his baby, and John Wyatt did so rely to his detriment and injury. Upon information and belief, Colleen Fahland's false statements

13

were made at the direction of McDermott, on his behalf and on behalf of all the defendants, in order to mislead John Wyatt.

45.   On or about February 4, 2009, Colleen Fahland and her father went to McDermott's office. McDermott directed Colleen Fahland to call John Wyatt and mention a possible adoption. As this was contrary to everything she had previously said to John Wyatt, he did not believe her and terminated the call. McDermott and her father then directed Colleen Fahland to send a text message to John Wyatt indicating she was receiving information about a possible Utah adoption.

46.   Colleen Fahland and John Wyatt spoke personally at length later on February 4, 2009, and Colleen Fahland again falsely stated to John Wyatt that she intended that they would raise their baby together. From then until February 10, 2009, Colleen Fahland continued to repeatedly falsely state to John Wyatt her intention that they would raise their baby together and would jointly decide how to best handle the baby's future. She had been making these same statements since they first discussed the pregnancy.

47.   Colleen Fahland and John Wyatt spoke on February 9, 2009 and at length after midnight on February 10, 2009, in a call starting at 12:23 a.m., reconfirming their love for each other, that he would be present at the birth, and the role the baby would play in their future. During these conversations, Colleen Fahland fraudulently concealed the fact that she was in labor and that proceedings for the adoption of the baby were underway. She did this under the specific direction of McDermott acting individually on his behalf and on behalf of the other co-conspirators and defendants herein. As a result of these concealments, John Wyatt was mislead into not taking expeditious steps to protect his rights as the biological father.

14

48. Colleen Fahland acted under the direction and advice of McDermott who, upon information and belief, knew of the threats and coercion of her parents. McDermott was retained and paid by Colleen Fahland's parents. He was not representing the best interests or free will of his supposed real client, Colleen Fahland.

49. Colleen Fahland has since stated that she was instructed by McDermott (and apparently his fellow conspirators) to fraudulently mislead John Wyatt. She has further admitted through her new counsel (not McDermott) that this was a mistake on her part. She has further claimed that she now wants to have joint custody of Baby Emma and participate in the rearing of Baby Emma.

50. At 12:22 A.M. on February 10, 2009, only moments before Colleen Fahland and John Wyatt's phone call began, Laraine Moon of Act of Love and the Zarembinskis (having flown from Utah to Virginia) checked into motels in Prince William County, Virginia a few blocks from each other, and in proximity to the hospital where Baby Emma was born ten hours later.

51. Baby Emma was born on February 10, 2009 at 11:02 A.M.

**Defendants Execute Scheme to Secretly Remove Baby Emma From Virginia**

52. On February 10, 2009, the Zarembinskis, while in Prince William County, Virginia, signed an "Act of Love At-Risk Placement Agreement." They acknowledged therein that the parental rights of one or both of the biological parents may not have been terminated; that the biological mother may not provide complete, accurate or truthful information concerning the biological father; and that Act of Love could not guarantee that the biological parents may not try to challenge the adoption.

15

53. At this time, McDermott, Jenkins and Act of Love all knew that Colleen Fahland was making false misrepresentations to John Wyatt as to her intent to rear their child together and that John Wyatt would rely upon these false misrepresentations in failing to take steps to protect his legal rights and those of Baby Emma to the detriment and injury of both Baby Emma and him. McDermott, Jenkins and Act of Love also knew that to effectuate their scheme to spirit Baby Emma out of Virginia, that false information would be provided to the Commonwealth of Virginia concerning John Wyatt's location in order to prevent or hinder the Virginia authorities from taking steps to protect John Wyatt's rights as the biological father of Baby Emma.

54. On February 10 and February 11, 2009, John Wyatt, having been told by Colleen Fahland that he would be involved in the baby's birth and in rearing the baby as late as 1:00 A.M. on February 10, 2009, was unaware that Colleen Fahland was in labor or of the birth of Baby Emma, or that the Zarembinskis and Moon had flown to Virginia. He continually tried to reach Colleen. Finally his mother, Jeri Wyatt, learned on February 11, 2009, after a number of phone calls, that a "Baby Girl Fahland" had been born at Potomac Hospital.

55. Upon learning that his daughter had been born, John Wyatt immediately took steps to see his daughter and to participate as her father in her care, support and assistance. John Wyatt went to the hospital on February 11, 2009 and saw Colleen Fahland's parents' car in the parking lot.

56. In response to John and Jeri Wyatt's requests to see Baby Emma and her mother, the hospital's Director of Patient Services and another hospital employee personally told John and Jeri Wyatt that there was no baby or mother at that hospital by the name of Fahland, even though Colleen Fahland had signed a hospital form that the baby birth's could be made known to visitors

16

and callers.  Hospital personnel knew that the Wyatts were purposely lied to.  Indeed, Baby

Emma's medical records disclose that McDermott's name, address and phone number were

included in the medical records.

57.  The Wyatts also were delayed in the hospital's lobby area so that Colleen Fahland

and Baby Emma could be discharged and spirited out a rear door of the hospital without the

Wyatts' knowledge.  Colleen Fahland and Baby Emma were taken to a motel room rented by

Moon at the Fairfield Inn in Prince William County, Virginia.  For this and the next several days,

John Wyatt was unable to reach Colleen Fahland by phone or otherwise as she and Baby Emma

were being secreted away from him in furtherance of the fraud and conspiracy to deprive him of

his rights.

### Execution of False Adoption Documents

58.  Later that same day, February 11, 2009, Moon hired a notary public who went to the

Fairfield Inn to notarize the signature of Colleen Fahland on documents described in ¶¶59-63,

*infra.*  The notary observed that Colleen Fahland was extremely emotional, so much so that she

had to leave the room at one point.  The notary was asked by McDermott and Moon to notarize

documents that contained blanks to be filled in later.  Because this request was improper and

would constitute a violation of Virginia criminal law, the notary refused to notarize documents in

blank.  Some of those blanks, which included the address and location of John Wyatt, were then

filled in with question marks, as described in ¶61, *infra,* and the documents were notarized.  The

notary was paid in cash by Moon.

59.  One of the documents that Colleen Fahland signed was the Virginia Interstate

Compact on Placement of Children Request identifying the father as John Wyatt.  She also

signed an Affidavit stating that she had informed John Wyatt on February 4 and February 5, 2009 that she was working with a Utah adoption agency. The statements in the Affidavit were false in that Colleen Fahland had consistently told John Wyatt between February 4 and February 10, 2009, including just several hours before the baby was born, that he would participate in the birth and rearing of their child, Baby Emma. The false statements in her affidavit were made by Colleen Fahland with the intent that they would be relied upon by the Virginia Interstate Compact Placement office so that the Virginia authorities would allow Baby Emma to be taken from Virginia and transported to Utah without notifying John Wyatt or obtaining his consent.

60. Virginia law (*see* § 63.2-1233, Code of Virginia) requires a three day waiting period following the birth of a child before a mother can relinquish parental rights. McDermott, Moon, Act of Love, the Zarembinskis, and Jenkins, however, all acted fraudulently in conspiring to and inducing Colleen Fahland on February 11, 2009 to sign a Birth Mother's Waiver of Virginia Law in Adoption Proceeding. The law of Virginia governs Baby Emma, and the ploy to have Colleen Fahland sign the waiver was to help effect the kidnapping of the baby.

61. On February 11, 2009, Colleen Fahland signed an Affidavit of Paternity, witnessed by her mother, in which Colleen Fahland identified John Wyatt as the birth father. Although both Colleen Fahland and her mother knew or could readily ascertain John Wyatt's address, a question mark was placed next to his address. (The question mark placed in the blank requesting the biological father's address was one of the blanks that contained no information when the notary was first asked, and refused, to notarize the document.) The question mark was placed at the direction of McDermott who had instructed Colleen Fahland to conceal John Wyatt's address. At the direction of McDermott, other false information was provided in the affidavit.

18

McDermott also falsely directed Colleen Fahland to not include John Wyatt's name on the original birth certificate which had to be amended months later.

62.  On February 12, 2009, the Wyatts had become aware that Baby Emma had been born, but had absolutely no idea where she was being hidden, and Colleen Fahland was, on instruction of her attorney and his co-conspirators and her parents, not answering her cell phone.

63.  On this same date, a different notary public was brought to the rooms at the Fairfield Inn where Colleen Fahland and Baby Emma were staying.  They were again joined by McDermott, Mrs. Fahland, and Sr. Lisa Lorenz.  At this time, these individuals, in furtherance of the conspiracy, transferred Baby Emma to the possession of the Zarembinskis.  Since that time, the Zarembinskis have retained possession of Baby Emma, with Act of Love claiming custody of Baby Emma.

64.  On February 12, 2009, Colleen Fahland signed an Affidavit of Relinquishment and Consent to Adoption, transferring Baby Emma to Act of Love.  Laraine Moon also signed the document on behalf of Act of Love.  The document was witnessed by co-conspirators McDermott and Sr. Lisa Lorenz.

65.  As of this time, all of the co-conspirators named above knew that John Wyatt had no knowledge: as to the location of his baby; that an attempted adoption was going forward; the existence of the Zarembinskis; the identification of Act of Love; the involvement of Larry Jenkins and Mark McDermott; the involvement of Sr. Lisa Lorenz; that there were filings to remove Baby Emma from the Commonwealth of Virginia; or the existence of the documents signed by Colleen Fahland.  He had not waived the application of Virginia law, and three days had not yet elapsed under Virginia law before a baby, born and present in Virginia, could be

19

adopted from that baby's natural parents.

66. As of February 12, 2009 when the relinquishment documents were signed by Colleen Fahland, the 24-hour period for John Wyatt to register as a putative father in Utah had expired. Because he had been lied to and kept in the dark as to the foregoing matters, John Wyatt, even if he had been of a mind to register, was defrauded of the opportunity to register. Further, because John Wyatt's address had not been included on the relinquishment or ICPC papers, he was not given the notice required under Virginia law.

### McDermott and Jenkins Submit False Information to Virginia Authorities

67. On that same date, February 12, 2009, McDermott sent a letter with several of the fraudulent documents to the Virginia Interstate Compact Office to obtain permission for Act of Love to take Baby Emma across state lines. The false information provided to the Compact Office was coerced from Colleen Fahland by threats of her parents and wrongful direction by Laraine Moon and also from McDermott, who was being paid by Colleen Fahland's father and/or the Zarembinskis. McDermott intended that the Virginia Interstate Compact Office would rely upon the false information that he provided, and as a result, prevent or hinder the Interstate Compact Office from taking steps to protect John Wyatt's parental rights and from preventing the spiriting of Baby Emma across state lines -- all to the detriment and injury of John Wyatt and Baby Emma.

68. A copy of the false communication to the Virginia Interstate Compact Office was provided to defendant Larry Jenkins on February 12, 2009. A member of his firm, Wood Jenkins LLC, wrote to the ICPC Administrator also providing false and fraudulent information.

69. Although John Wyatt's location was known or readily ascertainable to all of the

defendants and co-conspirators at this point in time, none of these communications were provided to John Wyatt.

### John Wyatt Retains Counsel, But Baby Emma Is Taken from Virginia

70.   John Wyatt, having been unable to locate or contact Colleen Fahland or his baby, and having been lied to by the hospital about the birth of his child, hired an attorney, James Binder. On February 12, 2009, Binder had a letter delivered to the Fahland home in Stafford County, Virginia demanding information and that John Wyatt be allowed to see his newborn daughter.

71.   On the same day, the Zarembinskis had taken full possession and control of Baby Emma. Upon information and belief, the Zarembinskis took Baby Emma to Potomac Hospital for a checkup. Chandra Zarembinski, in furtherance of the conspiracy, informed the hospital that all information about Baby Emma was to be concealed from the baby's biological father, John Wyatt. The Zarembinskis as of that date or soon thereafter, contrary to the laws of both Virginia and Utah, changed the baby's name in official records and elsewhere to "Baby Zarembinski."

72.   On February 13, 2009, McDermott replied to James Binder's letter by stating that John Wyatt could not see his baby unless he consented to an adoption. This is an acknowledgement of John Wyatt's parental rights. Binder immediately replied that John Wyatt would not accede to extortion and would seek custody of his baby. McDermott refused to disclose the baby's location or who had the baby. He also did not notify Binder of any of the documents that were signed by Colleen Fahland or the filings with the Virginia agency.

73.   On February 13 and 14, 2009, the Virginia Interstate Placement Unit ("IPU"), in response to the letters and fraudulent information provided by McDermott and Jenkins, acting on behalf of the Zarembinskis and Act of Love, contacted the Utah ICPC seeking approval of the

interstate transportation of Baby Emma to Utah. Neither John Wyatt nor his attorney was informed of these events.

74. On February 17, 2009, the Utah ICPC gave verbal approval to Act of Love for the transfer based upon the fraudulent information received from the conspirators. Shortly thereafter the Zarembinskis completed the conspiracy for the physical kidnapping of Baby Emma and removed her from the Commonwealth of Virginia to Utah.

75. The removal of Baby Emma to Utah was approved by the various IPU and ICPC offices in Virginia and Utah on the basis of the fraudulent documents and information supplied by McDermott, Moon, Act of Love, Fahland's parents, Sr. Lorenz and the Zarembinskis, and filed by Jenkins on behalf of Act of Love and the Zarembinskis.

76. At no time was John Wyatt or Jeri Wyatt aware that Baby Emma had been transferred to Act of Love, was in the possession of the Zarembinskis, or had been removed from the Commonwealth of Virginia. This information was purposely concealed from them and from John Wyatt's attorney.

### John Wyatt Files Custody Petition

77. On February 18, 2009, John Wyatt filed a Petition for Custody in Stafford County, Virginia. Under the existing federal law, the PKPA and the Uniform Adoption Act, this filing vested jurisdiction over custody of Baby Emma in the courts of Virginia. On May 13, 2009, The Honorable Gerald Daltan, Juvenile & Domestic Relations Court of Stafford County, Virginia, found:

> The appropriate venue of this case is Stafford County, Virginia. The Commonwealth of Virginia is the appropriate jurisdiction for determination of custody in this matter.

22

That Order was made final on December 11, 2009 (*see, infra*) and has not been appealed.

### Jenkins Files Petition for Adoption in Utah and Fraudulently Conceals John Wyatt's Address in Submissions to Utah and Virginia Authorities

78. On February 23, 2009, defendant Jenkins filed a Petition for Adoption in Utah seeking custody of Baby Emma for the Zarembinskis.

79. Between February 24, 2009 and March 5, 2009, various documents were sent between defendants Act of Love and Jenkins, and the Utah and Virginia Interstate Compact offices. The documents fraudulently provided information based on the concealment of John Wyatt's address, and indeed, a Utah Certificate of Search of Paternity on February 25, 2009 indicated the father was not listed on the birth certificate. Conspirator McDermott had instructed Colleen Fahland not to list John Wyatt's name as the father on the birth certificate.

80. On March 5, 2009, the Virginia Interstate Placement Unit ["IPU"], based on the false and fraudulent documents and information provided by or on behalf of all defendants, completed the approval of the transfer of Baby Emma for placement with defendant Act of Love.

81. On March 14, 2009, a Virginia birth certificate issued for Baby Emma, and falsely omitted John Wyatt as the father. The true birth certificate was issued on July 7, 2009 showing Colleen Fahland and John Wyatt as Baby Emma's parents. By this time, much of the damage had been done.

82. On March 30, 2009, Jenkins' office informed the Virginia Putative Father Registry ("Virginia Registry") that Jenkins would be supplying confidential information not to be disclosed to the birth father, John Wyatt. This was done in furtherance of the conspiracy to keep John Wyatt in the dark so he could not discover the fraud committed by the conspirators or the whereabouts of his daughter, Baby Emma and to hinder or prevent the Virginia authorities from

23

acting to protect John Wyatt's rights as the biological father of Baby Emma.

83. Jenkins falsely represented to the Virginia Registry that if there was a "hit" as to the father of the baby, Jenkins would be responsible for giving notice to the father. This false representation was made to cover up the fraud by inducing the Virginia agency not to supply information to John Wyatt, and indeed, the Virginia Registry apparently relied upon Jenkins' false misrepresentations and did not supply information to John Wyatt.

84. As of that time, Jenkins had a "hit" in that he fully knew John Wyatt was the natural, biological father of Baby Emma, and upon information, Jenkins had been provided or had ready access to the exact address of John Wyatt and had the name and address of John Wyatt's attorney.

85. On April 6, 2009, Jenkins sent a 10-page document to the Virginia Registry again demanding that it be kept confidential and again fraudulently claiming his office would give notice to the father if there were a "hit." This statement was false and known to be false when Jenkins made his filing. None of the confidential information was provided to John Wyatt or his attorney, Mr. Binder. Also, relying upon these false misrepresentations of Jenkins to the Virginia Putative Father Registry, the Virginia authorities did not act to prevent the taking of Baby Emma across state lines without legal authority, which has directly resulted in injury to John Wyatt and Baby Emma by being denied their constitutional and statutory rights.

### John Wyatt Files with Virginia Putative Father Registry and Obtains Virginia Court Order That He Was Not Properly Notified of Relinquishment

86. On April 8, 2009, John Wyatt filed with the Virginia Putative Father Registry, which notified Jenkins on April 13, 2009. Despite the "hit" and his assurances to the Virginia Registry that he would provide notice to John Wyatt when a "hit" occurred, Jenkins continued his

24

fraudulent conduct to hinder and prevent John Wyatt from securing his parental rights by failing to provide information to John Wyatt or his attorney.

87. Thereafter, Child Adoption Services filed a report with the Stafford, Virginia JDR Court stating that it would be in the best interests of Baby Emma for John Wyatt to be afforded the opportunity to have custody with appropriate support.

88. On May 13, 2009, the Stafford County, Virginia JDR Court ruled, *inter alia*, that John Wyatt was not properly notified of the relinquishment of the mother's parental rights to a child placement agency and of the placement of the child for adoption with an adoptive family in the state of Utah. The court further ruled that "the proceeding for adoption in the state of Utah may not result in a valid adoption of the child without the consent of the putative father, who appears to be John Maxwell Wyatt, III" and that "Mr. Wyatt has filed a motion to dismiss the adoption proceedings in the state of Utah. At the very least, Mr. Wyatt is entitled to legal notice in adoption proceedings in the state of Utah and should be allowed to object to the adoption." The court ordered that:

> The appropriate venue of this case is Stafford County, VA. The Commonwealth of VA is the appropriate jurisdiction for the determination of custody in this matter.

(Exhibit 1).

### John Wyatt Initiates Proceedings in Utah to Stop Adoption of Baby Emma

89. John Wyatt sought to intervene in the Utah adoption proceeding to stop the adoption of Baby Emma. Despite the mandates of the PKPA, that motion was denied.

90. That ruling was appealed to the Utah Court of Appeals, which for reasons unknown, certified the matter to the Utah Supreme Court. Putative fathers from other states and even from

25

outside the United States have routinely been unable to enforce their parental rights in the Utah courts, which often use strict interpretations of Utah's draconian procedural requirements to deny these substantive rights.

### John Wyatt Is Awarded Custody of Baby Emma

91. On August 24, 2009, the Stafford JDR Court held a full evidentiary hearing on the custody of Baby Emma. The court determined that John Wyatt was a suitable father and that John Wyatt's custody of Baby Emma was in the child's best interests.

92. Defendant McDermott did not participate in the August 24, 2009 hearing on behalf of Colleen Fahland in the Stafford JDR Court because of an undisclosed "conflict of interest," which led him to withdraw from further representation.

93. On August 24, 2009, the Stafford JDR Court issued a *pendente lite* Order of Child Custody awarding *pendente lite* custody of Baby Emma to John Wyatt until final hearing and ordering that Baby Emma forthwith be provided to John Wyatt, and further that the Commissioner of the Virginia Department of Social Services was to cause the immediate and forthwith return of Baby Emma to Virginia and to John Wyatt. (Exhibit 2).

94. None of the ordered actions were accomplished. Instead, on August 25, 2010, an order was entered by the Utah courts *ex parte* giving temporary custody of Baby Emma to the Zarembinskis. This was subsequent to the initial ruling of the Stafford JDR Court of May 13, 2009, which proceedings were known to the defendants. It also was after the Stafford JDR Court issued its *pendente lite* Order of Child Custody to Jon Wyatt.

95. Notwithstanding the rulings and orders of the Virginia court and the laws of the Commonwealth of Virginia, defendants Act of Love and the Zarembinskis have maintained

26

possession and control of Baby Emma, acting upon the advice and at the direction of Jenkins. This constitutes kidnapping under Virginia Law (Virginia Code Section 18.2-49.1(A)).

96. On December 11, 2009, the Stafford JDR Court awarded John Wyatt full custody of Baby Emma and ordered, *inter alia* that:  Baby Emma be provided forthwith to John Wyatt; Virginia was the appropriate and exclusive jurisdiction over custody of Baby Emma; no other state had the authority to exercise jurisdiction during pendency of the proceedings; any exercise of jurisdiction by Utah would be inconsistent with provisions of the PKPA; the Zarembinskis and Act of Love had been properly notified of the Virginia proceedings and failed to appear in person or by counsel despite the fact that the Court had previously ruled that it had jurisdiction and venue over Baby Emma and that Virginia is the home pursuant to the Uniform Child Custody Jurisdiction and Enforcement Act ["UCCJEA"] and the PKPA; John Wyatt had fully preserved his parental rights to contest an adoption in Virginia under the relevant Virginia Code; John Wyatt was not required to register with the Virginia Putative Father Registry to preserve his parental rights; John Wyatt and Colleen Fahland had complied with the birth certificate affidavit prior to an adoption being granted; there was no evidence presented to the Court to show that John Wyatt was unfit to have care and custody of the child; there was clear and convincing evidence that John Wyatt had formulated a plan related to the best interests of Baby Emma; the evidence indicated that John Wyatt had done everything he needed to do to be the biological and actual father; John Wyatt did not abandon or neglect Baby Emma or her mother during the pregnancy or after the birth; John Wyatt had complied with all Virginia statutes; and John Wyatt did not consent to the adoption of Baby Emma or relinquishing his parental rights. (Exhibit 3).

97. The Order of December 11, 2009 was never appealed and became final and binding

27

twenty-one (21) days after its entry.  Pursuant to the PKPA, this Order clearly governs custody of

Baby Emma.

### Refusal of Utah Courts to Follow PKPA and of Act of Love and Zarembinskis to Return Baby Emma

98.  The Utah courts have not followed the mandate of the PKPA and so a determination

by this Court of its applicability is necessary to fully assess the damages in this matter.

99.  As of the filing of this lawsuit, Act of Love and the Zarembinskis continue to possess

and control Baby Emma in violation of the federal PKPA statute, the laws of the Commonwealth

of Virginia, the Order of the Virginia court granting custody to John Wyatt, the rights and best

interests of Baby Emma to be with her biological father and accessible to her biological mother,

the parental rights of John Wyatt, and the familial rights of Jeri Wyatt.

100.  The Uniform Adoption Act specifically calls for the protection of "minor children

against unnecessary separation from their birth parents."  Yet, John Wyatt has never been

allowed to see or visit with his daughter because he refused to accede to the extortionate

demands of all the defendants and co-conspirators that he would have to surrender his parental

rights to do so.  He has been denied the emotional attachments to Baby Emma that derive from

the intimacy of daily association with her and to contribute to Baby Emma's development.

101.  John Wyatt is ready, willing and able to care for Baby Emma in every respect,

including physically, emotionally, and in every other way in order to fully support and sustain

her best interests and welfare.  As the Stafford Juvenile and Domestic Relations Court found,

John Wyatt has formulated a plan related to the best interests of Baby Emma and to fully care for

her needs and has done everything he needs to do to be her biological and natural father.

28

## Defendants' Continued Interference with John Wyatt's Parental Rights

102.   In addition to continuing to possess and control Baby Emma in violation of federal and state law, the Zarembinskis also have acted individually and in furtherance of the conspiracy to interfere with John Wyatt's attempt to exercise his parental right to see his daughter, Baby Emma, and to find out about her wellbeing.

103.   On or about September 9, 2010, John Wyatt went to the Zarembinskis residence to find out how Baby Emma was doing. John Wyatt rang the doorbell of the residence, but no one answered the door. John Wyatt then left a bouquet of flowers and a card at the front door for Baby Emma. John Wyatt did not create any disturbance, as is confirmed by a video of the visit which was filmed by individuals from a local television news channel.

104.   Following this visit, Defendant Thomas Zarembinski filed in the District Court, Third Judicial District, Salt Lake County, Utah, a Request for Civil Stalking Injunction alleging two purported "stalking" events. The first alleged event occurred on March 18, 2009 -- seven months before John Wyatt visited the Zarembinskis' residence -- when John Wyatt called the cell phone number of Chandra Zarembinski to inquire about his one month old daughter, whom he had never seen. Ms. Zarembinski did not answer, and John Wyatt did not leave a message. He did not call again. The second alleged "stalking event" was the occasion on September 9, 2010 described above when John Wyatt rang the doorbell of the Zarembinskis' house.

105.   In neither of the above events did John Wyatt take any action that was remotely threatening to the Zarembinskis or that could remotely be considered stalking.

106.   Nonetheless, the Request for Civil Stalking Injunction, which Thomas Zarembinski signed under oath, was made in order to obtain a Civil Stalking Injunction under false pretenses,

29

and to use the process of the Utah state courts to interfere with and deny John Wyatt his parental

rights including his right to obtain information about the wellbeing of his daughter, Baby Emma.

107.   Based upon the false request of Thomas Zarembinski contained in the Request for

Civil Stalking Injunction, the Third District Court, on or about September 29, 2010, issued an *ex*

*parte* Temporary Civil Stalking Injunction prohibiting John Wyatt from having any contact or

communication with the Zarembinskis and requiring him to stay away from their house and cars.

In addition, the order prevented John Wyatt from having any contact or communication with his

own daughter, Baby Emma, although he had a custody order for his child from the Virginia

court.

108.   There was no probable cause for the issuance of the Third District Court's

injunction and that injunction had the effect of interfering with John Wyatt's parental rights in

violation of federal and state law.

109.   Upon learning that a court injunction had been issued, John Wyatt, through his

legal counsel, sought and obtained a hearing before the Third District Court to challenge the

basis upon which the injunction had been issued and the legitimacy of the court order.

110.   At the hearing, which was held on December 7, 2010, the Third District Court

found that there was no proper legal basis for the injunction to have been issued. Accordingly,

the court vacated the injunction.

111.   Although there is no legal basis for the Zarembinskis, Act of Love, and Larry

Jenkins to deny Baby Emma contact with, and access to, her biological father, John Wyatt, and

her grandmother, Jeri Wyatt, they have continued to do so. As a consequence, John Wyatt has

been denied his parental rights and Jeri Wyatt has been denied her familial rights as recognized

30

by federal and state law.

## VI. CAUSES OF ACTION

### A. COMMON LAW CONSPIRACY - JOHN WYATT, JERI WYATT & BABY EMMA

112. Paragraphs 1 through 111 are adopted as if fully set forth herein and are incorporated herein.

113. Each of the defendants and co-conspirators acted in concert, agreed, associated, mutually undertook and combined together to intentionally and purposely commit the wrongful and tortious acts against all of the plaintiffs as set forth above.

114. The concerted and purposeful actions of the defendants and co-conspirators have denied to John Wyatt his parental rights and wrongfully interfered with his ability to establish and assert those rights; denied to Jeri Wyatt her familial rights to know, help raise, and enjoy the company of her only grandchild, Baby Emma; and denied to Baby Emma her right to know her biological parents and to be raised in the natural home of her biological father. Baby Emma's mother, Colleen Fahland, also has publicly stated through her attorney and privately informed others that she regrets what she was forced to do in giving up her daughter and that if Baby Emma is returned she wants some custody and the chance to raise her own daughter.

115. Each of the conspirators is fully responsible for the acts of each other. The total effect of the conspiracy not only is tortious, but, indeed, also is a criminal act tantamount to kidnapping under § 18.2-49.1 of the Code of Virginia. The actions of the conspirators violate federal statutes, laws and regulations of the Commonwealth of Virginia, and the Orders of Virginia courts.

116. As set forth above, each of the three plaintiffs have been seriously damaged by the effect of this conspiracy, which damages are continuing and will be felt and continue to cause damage in the future.

## B. WRONGFUL AND TORTIOUS INTERFERENCE WITH PARENTAL RIGHTS - JOHN WYATT

117. Paragraphs 1 through 116 are adopted herein as though fully set forth.

118. John Wyatt has parental rights to and in his relationship with Baby Emma. The right of a biological father to develop and to maintain a relationship with his child is a fundamental right recognized by the United States Supreme Court and federal law. Further, John Wyatt's parental and custodial rights to Baby Emma specifically have been recognized by the Stafford County Juvenile and Domestic Relations Court, and Virginia law makes it a criminal offense to interfere with a legal guardian's custody of a minor child by withholding the child outside of the Commonwealth, Va. Code Ann. § 18.2-49.1(A), and to aid or abet in such an offense, Va. Code Ann. § 18.2-18. When a biological father like John Wyatt demonstrates a full commitment to the responsibilities of parenthood and evidences his willingness and ability to participate in the rearing of his child, his interest in personal contact with his child also acquires substantial protection under the Due Process Clause in Art. 1, § 11 of the Virginia Constitution.

119. By virtue of his actions to participate in the birth of Baby Emma, and to rear Baby Emma together with her mother, Colleen Fahland; to offer to pay for medical treatment of Colleen Fahland while she was pregnant and any medical expenses for Baby Emma; to formulate a plan related to the best interests of Baby Emma, and to undertake everything he needed and could reasonably be expected to do to develop a custodial relationship with Baby Emma, John

Wyatt demonstrated a full commitment to the responsibilities of parenthood. John Wyatt's full commitment as a father to Baby Emma was recognized by the Virginia courts in granting him custody of Baby Emma, and his interest in personal contact with Baby Emma finds protection under the Due Process Clause of both the U.S. Constitution and the Constitution of the Commonwealth of Virginia.

120. Each of the defendants was aware that John Wyatt was the father of Baby Emma and of his parental rights as the father of the child.

121. Notwithstanding this knowledge, the defendants intentionally and willfully used improper, unethical and fraudulent means and methods with the specific intent to preclude John Wyatt from establishing a parental relationship with Baby Emma and to interfere with his parental rights with the aim of depriving John Wyatt of those rights.

122. The actions of all defendants as set forth above have clearly resulted in the violation of these rights, causing John Wyatt damages for which he seeks compensation.

### C. ASSAULT AND BATTERY AND KIDNAPPING - BABY EMMA

123. Paragraphs 1 through 122 are adopted herein as though fully set forth.

124. The defendants acting through intimidation and deception and without legal justification or excuse seized, took, transplanted and secreted Baby Emma with the intent of depriving John Wyatt of his parental rights and Baby Emma of her personal liberty to be with her natural father.

125. None of the actions of the defendants was taken in the best interests of Baby Emma. Rather, the actions were taken for the benefit of each and all of the defendants. When the Zarembinskis hired Act of Love in 2008, they had never heard of Baby Emma -- they just wanted

33

a baby. When Act of Love first took the Zarembinskis' money, Act of Love had never heard of Baby Emma. When Moon flew to Virginia it was to procure a baby for the Zarembinskis and not to benefit Baby Emma. Jenkins represented Act of Love and, through Act of Love, the Zarembinskis long before he heard of Baby Emma. McDermott was paid by the Fahland parents (and perhaps the Zarembinskis) to remove Baby Emma from Virginia and from their daughter's life, without any care or concern about the family to whom Baby Emma was given. Their only concern was that Baby Emma not be with her biological father or biological mother. Indeed, if it were for the Fahlands to decide, Baby Emma would have been aborted during the third month of gestation. None of these actions were taken in the best interests of Baby Emma, but for the sole benefit of each and all of the defendants, depending on their varying interests.

126. The wrongful taking of Baby Emma constitutes a kidnapping and further constitutes an assault and battery against her person.

127. Baby Emma, as a result of the separation from her natural father and potentially total separation from her natural mother, will suffer grave injuries. John Wyatt, as the lawful parent and next friend of Baby Emma, hereby seeks damages for her in order to compensate her for the injuries resulting from actions by all defendants.

### D. DENIAL OF CIVIL RIGHTS § 1983 -- JOHN WYATT AND BABY EMMA

128. Paragraphs 1 through 127 are adopted herein as though fully set forth.

129. The U. S. Supreme Court and numerous state supreme courts have held that the rights of natural parents to the custody and possession of their children and, in particular, the right of a biological father to develop a relationship with his son or daughter, are among the highest of natural rights. Indeed, the United States Supreme Court has specifically held that a

parent's right to raise one's children is a fundamental liberty interest protected by the Constitutional guarantee of due process and is, in fact, one of the oldest fundamental liberty interests recognized by the United States Supreme Court. *See, Troxel v. Grandville*, 530 U.S. 57 (2000). Similarly, a child has a fundamental right to establish a father-child relationship.

130. As set forth in paragraphs 33 through 39 above, the state of Utah through its legislature, administrative agencies and courts has established a system that serves to deprive biological fathers of the opportunity to develop a relationship with their natural born children in violation of the father's constitutional rights.

131. Defendant Jenkins has acted under color of state law both as an agent of the Utah state legislature and in joint participation with Utah state officials, as part of a pattern and practice of long-term interdependence, to use the law and procedures developed by the Utah state authorities to deprive biological fathers, such as John Wyatt, of their constitutionally recognized parental rights. In doing so, Jenkins invokes the aid and assistance of Utah state officials to take advantage of the state-created custody and adoption procedures. This interdependence and joint participation between Jenkins and the state of Utah includes, but is not limited to, the following:

A. In the past decade, Jenkins and his law firm, Wood Jenkins, LLC, working together with others for the common interest in furthering the lucrative business involving the sale and adoption of children, have acted in conjunction and coordination with the Utah legislature to draft and enact highly restrictive laws to ensure that the natural father of a child will be unable to protect and exercise his parental rights before the child is placed for adoption. Very often, Jenkins and those acting in concert with him advise the unwed mother to travel to Utah for the birth of the child, so that the restrictive Utah laws they secured will be applied and the father will

be deprived of his constitutional rights and to conceal any adoption from the child's father.

B. One of the laws requires a putative father to register in Utah within 24 hours of the birth of his child. This strict time limit enables defendant Jenkins and others similarly situated to induce clients who are unwed mothers to provide false information to biological fathers regarding the birth of their children or the rearing of the children. Relying on the false information, the biological father, then, fails to register or take protective legal steps in Utah prior to the birth of his child.

C. Even if a biological father becomes aware of the child's birth, few know of the Utah putative father registry which is apparently purposely virtually impossible to locate, and even if a father successfully registers within the 24 hours time period, the documents are altered or delayed by Utah administrative officials. Courts in Utah have taken the position that under Utah statutes it is the putative father's fault for the misconduct of the Utah officials, and he has no right to contest custody and oppose adoption of his child.

D. Even where there is actual proven fraud, the Utah legislature, with the participation of Jenkins and those in concert with him, has established a statutory scheme whereby such fraud is not grounds to set aside an adoption, but merely grounds for damages. This unconstitutional procedure enables defendant Jenkins and other adoption lawyers in Utah to use the Utah laws, which they proposed and pushed to be enacted into law, to deprive biological fathers of their constitutional rights, privileges and immunities, and to deny to children their rights to know their biological fathers.

132. Jenkins and his co-conspirators, including the Fahland parents, Sr. Lorenz, and Potomac Hospital personnel, as well as the other defendants herein, all conspired and cooperated

36

in defrauding the Wyatts so that the foregoing scheme under the Utah laws could be effected in removing Baby Emma from the Wyatts and placing her with the Zarembinskis as adoptive parents. In conspiring together, all defendants are responsible for each other's actions and share liability for defendant Jenkins acting under color of state law.

133. These actions of defendants acting jointly with the state of Utah have denied plaintiffs John Wyatt and Baby Emma various rights, privileges and immunities guaranteed by the U.S. Constitution, including, but not limited to, the right to due process of law and the right to equal protection of the laws.

134. Plaintiffs John Wyatt and Baby Emma each seek damages for denial of their rights and seek an award of legal fees upon their successful litigation of this matter.

### E. FRAUD - JOHN WYATT AND BABY EMMA

135. Paragraphs 1 through 134 are adopted herein as though fully set forth.

136. As set forth *supra*, a necessary element of the wrongful taking and kidnapping of Baby Emma was to defraud John Wyatt into believing that he would participate in the birth of Baby Emma; that he would fully participate in the rearing of Baby Emma as her father; and that, based on these beliefs, he would fail to take any timely legal action to protect his interests as the father of Baby Emma.

137. The defendants used Colleen Fahland as the vehicle to engage in their fraud. Co-conspirators, the Fahlands, threatened their daughter with loss of financial support, a home, family support, schooling, etc. in order to manipulate her into giving up her rights as the mother of Baby Emma and to provide false and misleading information on various documents and in person to the father, John Wyatt.

37

138. Defendant McDermott, with the knowledge and cooperation of all the other defendants, knowingly and intentionally instructed and induced Colleen Fahland to provide a pattern of false information to John Wyatt as to her purported intention that he would participate in the birth of Baby Emma and that they would rear the child together, all with the intent of misleading John Wyatt and of frustrating his efforts to obtain timely information as to the birth and whereabouts of his daughter so that he would not take timely legal action to protect his rights and those of his daughter. Said fraudulent information is more specifically set forth in ¶¶44-47 above as well as throughout this Complaint.

139. McDermott, Act of Love and Moon knowingly and intentionally induced and instructed Colleen Fahland to provide false information concerning John Wyatt on various documents to be filed with state agencies with the intent to induce and mislead those agencies to allow the kidnapping of Baby Emma and to prevent those agencies from notifying John Wyatt as to the defendants' actions denying him possession and custody of his child.

140. All the foregoing actions by McDermott, Moon and Act of Love were taken in concert with fellow conspirators Jenkins, the Zarembinskis, Mr. and Mrs. Fahland, Sr. Lorenz, and hospital authorities.

141. John Wyatt, acting individually and on behalf of his then-yet to be born child and for a short time after the birth of Baby Emma, relied on these false representations and as a result failed to take legal action to establish his parental rights and custody of Baby Emma earlier than he did.

142. As a result of the delayed legal action, John Wyatt has thus far been denied the fundamental right to develop a parental relationship with his daughter, Baby Emma, and her love

38

and companionship for an extended period of time.  He has never seen nor held his child.  He has also suffered other financial damages in legal fees and has suffered emotional distress.

143.  Baby Emma also is a victim of this fraud and will in the future suffer emotional damages as a result of this fraudulent scheme and the disruption of the natural bonds with her biological parents and paternal grandparent and entire natural family.

144.  Defendants, therefore, are liable to plaintiff John Wyatt, acting individually and on behalf of Baby Emma, for all of the damages as set out above.

### F. CONSTRUCTIVE FRAUD - JOHN WYATT AND BABY EMMA

145.  Paragraphs 1 through 144 are adopted herein as though fully set forth.

146.  As an alternative cause of action, defendants innocently or negligently made the false representations set forth above, expecting that John Wyatt, acting individually and on behalf of Baby Emma, would rely on those representations and act thereon.

147.  Defendants therefore are liable to John Wyatt, acting individually and on behalf of Baby Emma, for all of the damages, as set forth above.

### G. DECLARATORY JUDGMENT THAT VIRGINIA COURTS HAVE EXCLUSIVE JURISDICTION TO DETERMINE CUSTODY OF BABY EMMA

148.  Paragraphs 1 through 147 are adopted herein as though fully set forth.

149.  The federal Declaratory Judgment Act, 28 U.S.C. Sections 2201 and 2202, provides that where, as here, there is a case of actual controversy within the court's jurisdiction, the court may declare the rights and other legal relations of any interested party seeking such declaration. In this case, plaintiff John Wyatt seeks a declaration from this Court that pursuant to the federal Parental Kidnapping and Prevention Ac t ("PKPA"), 28 U.S.C.A. Section 1738(A), the courts of

the Commonwealth of Virginia have jurisdiction to award custody of his daughter, Baby Emma, and that the state of Utah is prohibited from modifying or interfering with any such award or determination.

150.   Additionally, plaintiffs seek this declaration pursuant to the Virginia Declaratory Judgment Act, Virginia Code Ann. 8.01-184, *et seq*. This Court also has supplemental jurisdiction over this declaratory judgment request. *See* 28 U.S.C. § 1367.

151.   Adjudication of this claim is not independent of plaintiff's other claims. Rather, it is a necessary part of adjudicating plaintiff's rights and liabilities, standing, and damages with respect to plaintiff's other causes of action and claims.

152.   The PKPA specifically sets forth the method for determining the state having jurisdiction to award custody of a child and prohibits any other state from exercising jurisdiction in the matter. The statute further requires that full faith and credit be given to child custody determinations by the state courts that have jurisdiction over custody. In *Thompson v. Thompson*, 484 U.S. 184 (1998), the United States Supreme Court found that the PKPA requires states to give full faith and credit to other state orders.

153.   As set forth more fully *supra*, under the facts of this case, Virginia has exclusive jurisdiction over the custody of Baby Emma, to-wit:

    a.    Baby Emma was born in Virginia on February 10, 2009.

    b.    John Wyatt, the natural father of Baby Emma and a "contestant" herein, has lived in Virginia continually from before Baby Emma's birth until the present.

    c.    Colleen Fahland, the natural mother of Baby Emma, has lived in Virginia continually from before Baby Emma's birth until the present.

d.  John Wyatt has consistently sought to exercise his parental rights and obligations since learning of Colleen Fahland's pregnancy.

e.  Baby Emma resided in Virginia with her birth mother for the first few days after her birth.

f.  On February 12, 2009, John Wyatt, through counsel, caused a letter to be hand-delivered to the birth mother's home address, which expressed his interest in visitation with and custody of Baby Emma.

g.  In response to this February 12, 2009 letter, on February 13, 2009, defendant McDermott responded that if John Wyatt wanted to see his daughter, he would first have to surrender all of his parental rights. Defendants recognized John Wyatt's lawful claim and they had no legally binding document to receive or keep Baby Emma.

h.  Baby Emma continued to reside in Virginia until February 17 or February 18, 2009 when she was kidnapped by the Zarembinskis.

i.  Prior to removing Baby Emma from Virginia, the Zarembinskis signed a document acknowledging that John Wyatt would not agree to the adoption and that the adoption was at-risk.

j.  Prior to removing Baby Emma from Virginia, the Zarembinskis and other defendants knew that Colleen Fahland had wanted the Zarembinskis to consult with John Wyatt and that John Wyatt wanted to keep his daughter, Baby Emma.

k.  Baby Emma was removed from Virginia through the efforts of all the defendants by the filing of false and perjured documents with state agencies in Virginia and Utah.

l.  On February 17, 2009, the Utah ICPC, based on fraudulent information provided by defendants, gave verbal permission to remove Baby Emma from Virginia.

m.  Baby Emma was removed from Virginia by "contestants" herein and has been held unlawfully in Utah, from her removal to the present, by contestants herein.

n.  On February 18, 2009, plaintiff John Wyatt filed a Petition for Custody of Baby Emma in the JDR Court of Stafford County, Virginia.

o.  This was the first court filing by any of the contestants with regard to Baby Emma.

p.  Five days later, on February 23, 2009, defendants Jenkins and Wood Jenkins filed a Petition for Adoption of Baby Emma in the Utah courts on behalf of defendants Act of Love and the Zarembinskis.

q.  On May 13, 2009, the Virginia Court in Stafford County ruled, *inter alia*, that the Utah court could not grant custody or a valid adoption of Baby Emma without John Wyatt's consent and that Virginia was the appropriate jurisdiction to determine custody.  *See* Exhibit 1.

r.  On August 24, 2009, the Stafford County JDR Court, *inter alia*, awarded *pendente lite* custody of Baby Emma to John Wyatt.  *See* Exhibit 2.

s.      On August 25, 2009, an order was entered by the Utah courts *ex parte* giving

temporary custody of Baby Emma to the Zarembinskis.  This was subsequent to

the initial ruling from the Virginia court of May 13, 2009, which proceedings

were known to the defendants.

t.      On December 11, 2009, the Stafford JDR Court awarded permanent custody to

John Wyatt and ruled it had jurisdiction under the UCCJEA and the PKPA (*see*

Exhibit 3).

u.      On April 28, 2009, the Utah court had excluded John Wyatt from intervening in

the adoption proceedings filed in Utah by the Zarembinskis, which is now on

appeal.  However, the PKPA, a federal law which supercedes state law,

prohibited Utah from taking action.  Under the PKPA, Virginia and not Utah is

the "home state" of the child where determinations must be made.

154.  Under the PKPA, the appropriate jurisdiction for the award of child custody is

determined by meeting certain conditions which include, *inter alia*, "(1) such court has

jurisdiction under the law of such State; and  (2) one of the following conditions is met:  (A)

such State (i) is the home State of the child on the date of the commencement of the [custody]

proceeding, or (ii) had been the child's home State within six months before the date of the

commencement of the [custody] proceeding and the child is absent from such  State because of

his removal or retention by a contestant or for other reasons, and a contestant continues to live in

such State."  28 U.S.C. Section 1738(A)(c).  In the case of Baby Emma, Virginia is the

appropriate jurisdiction for determining custody under Section 1738(A)(c).

155. Further, under the PKPA, the Utah courts are prohibited from exercising jurisdiction in a proceeding concerning Baby Emma during the pendency of a proceeding in Virginia. *See* 28 U.S.C.A. Section 1938(A)(g). As set forth by the Michigan Supreme Court in the case of *In re Clausen*, 509 N.W.2d 649, 442 Mich. 648 (Mich.1993) (more commonly referred to as the Baby Jessica case), "[c]ertainty and stability are given priority under PKPA, which gives the home state exclusive continuing jurisdiction." This is consistent with the legislative history of the PKPA and the UCCJEA. Additionally, under the PKPA, once the Virginia court has made a custody determination, jurisdiction continues with the Virginia court. *See* 28 U.S.C.A. Section 1738(A)(d).

156. Utah is prohibited from exercising jurisdiction in any proceeding for custody or visitation determination commenced during the pendency of the Virginia proceedings (28 U.S.C.A. 1738(A)(g)). Nor may Utah modify the Virginia court's determination unless Utah has jurisdiction (which it does not) and Virginia has declined to exercise such jurisdiction to modify such determination (which it has not) (28 U.S.C.A. 1738(A)(f)).

157. Accordingly, pursuant to the PKPA, jurisdiction over the custody of Baby Emma resides in the courts of the Commonwealth of Virginia. The state of Utah, therefore, is prohibited from exercising jurisdiction in any proceeding for custody or visitation of Baby Emma (28 U.S.C. Section 1738(A)(g)), nor may Utah modify a Virginia court's determination as to custody (28 U.S.C. Section 1738(A)(f)).

## J. PUNITIVE DAMAGES - JOHN WYATT, JERI WYATT, & BABY EMMA

158. Paragraphs 1 through 157 are adopted herein as though fully set forth.

159. Each of the plaintiffs seek punitive damages from each of the defendants for wilful,

44

wanton and reckless misconduct and gross negligence as set forth herein.

160. Each of the defendants, having engaged in an conspiracy with each other, are fully responsible for the actions of each other.   The willful and grossly negligent actions include:  (1) defendant McDermott directing and coercing the biological mother, Colleen Fahland, to defraud John Wyatt by supplying false information and to falsify documents and information to be filed with the Commonwealth of Virginia; (2) defendant Moon and defendant Act of Love assisting defendant McDermott in causing documents and information to be falsified and to be used or submitted to officials in the Commonwealth of Virginia and the State of Utah; (3) defendants Jenkins, Wood Jenkins, LLC, Act of Love, and McDermott in providing false documents and false information to the state of Utah and the Commonwealth of Virginia authorities in order to fraudulently obtain permission to transfer Baby Emma from Virginia; (4) defendants Thomas and Chandra Zarembinski in knowingly cooperating with the other defendants in the use of falsified documents; (5) defendants Moon, Act of Love and McDermott in seeking to have a notary public falsely notarize documents to be filled in afterwards and then, upon information and belief, filling in some blanks themselves; and (6) all defendants in wrongfully causing the removal of Baby Emma from her natural father and failing to cause the return of Baby Emma contrary to the rulings of the Virginia courts and the dictates of the laws of Virginia and the federal PKPA.

## VII. PRAYER FOR RELIEF

WHEREFORE,

1. John Wyatt seeks Ten Million Dollars in compensatory damages, jointly and

severally, against each of the named defendants for damages as set forth in each of the causes of action above.

2. Baby Emma seeks Ten Million Dollars in compensatory damages, jointly and severally, against each of the named defendants for damages as set forth in each of the causes of action as to her above.

3. Jeri Wyatt seeks One Million Dollars in compensatory damages, jointly and severally, against each of the named defendants for damages as set forth in each of the causes of action as to her above.

4. John Wyatt, Baby Emma and Jeri Wyatt each seek $350,000.00 punitive damages or the maximum allowed under Virginia law against each of the defendants for their wrongful actions as set forth above.

5. John Wyatt and Baby Emma seek legal fees for violation of their civil rights.

6. John Wyatt seeks a declaratory judgment that under the PKPA the courts of the Commonwealth of Virginia have jurisdiction over the custody of Baby Emma.

7. The plaintiffs seek their costs herein and such other relief as the Court deems just.

Respectfully submitted,

JOHN WYATT, JERI WYATT, & BABY EMMA,
By Counsel

COUNSEL FOR PLAINTIFFS:

_____

PHILIP J. HIRSCHKOP, VSB #04929
HIRSCHKOP & ASSOCIATES, P.C.
908 King Street, Suite 200
Alexandria, Virginia   22314
703-836-5555 / 703-548-3181 (fax)
hirschkoplaw@aol.com; pjhirschkop@aol.com

BERNARD J. DiMURO, VSB #18784
JONATHAN R. MOOK, VSB #19177
DiMURO GINSBURG P.C.
908 King Street, Suite 200
Alexandria, Virginia   22314
703-684-4333 / 703-548-3181 (fax)
bdimuro@dimuro.com; jmook@dimuro.com